## <u>ORAL ARGUMENT NOT YET SCHEDULED</u>

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA

No. 16-1101

_____

FLYERS RIGHTS EDUCATION FUND, INC, *et. al.,*
*Petitioners,*

v.

FEDERAL AVIATION ADMINISTRATION, *et. al.,*
*Respondents.*

_____

Petition for Review of Final Agency Action by the Federal Aviation
Administration

_____

## FINAL BRIEF FOR PETITIONERS

_____

Joseph E. Sandler
Sandler Reiff Lamb Rosenstein & Birkenstock P.C.
1025 Vermont Ave N.W. Suite 300
Washington, D.C. 20005
(202) 479-1111
Sandler@sandlerreiff.com
*Counsel for Petitioners*


November 18, 2016

**CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES**

**A. Parties:**

Petitioners

The Petitioners in this case are Flyers Rights Education Fund, Inc., d/b/a FlyersRights.org ("FlyersRights"), and Paul Hudson, the President of FlyersRights. FlyersRights is a District of Columbia nonprofit corporation recognized as an organization exempt from taxation under section 501(c)(3) of the Internal Revenue Code. FlyersRights educates the public about issues affecting airline passengers, and advocates for the interests of airline passengers. FlyersRights has no parent, subsidiary or affiliate and has never issued shares or debt securities to the public.

Respondents

The Respondents are the Federal Aviation Administration ("FAA"), Michael B. Huerta, Administrator of the FAA, The Department of Transportation, and Anthony R. Foxx, United States Secretary of Transportation.

**B. Rulings Under Review**

The ruling under review is a final Order of the FAA, dated February 1, 2016, denying FlyersRights' August 26, 2015 Petition for Rulemaking: Limitation of Seat Size Reductions, submitted pursuant to § 553(e) of the Administrative Procedure Act and 49 U.S.C. § 106. Docket No. FAA-2015-4011.

ii

**C. Related Cases**

FlyersRights is not aware of any related cases.

Respectfully submitted,

/s/ Joseph E. Sandler_____
Joseph E. Sandler

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, the undersigned counsel of record for Petitioners certifies that Flyers Rights Education Fund, Inc. is a District of Columbia nonprofit corporation recognized as an organization exempt from taxation under section 501(c)(3) of the Internal Revenue Code. FlyersRights has no parent, subsidiary or affiliate and has never issued shares or debt securities to the public.

## RECOMMENDATION ON ORAL ARGUMENT

Because of the novelty and public importance of the issues presented, Petitioners believe the Court may benefit from oral argument.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES ............. ii

CORPORATE DISCLOSURE STATEMENT ....................................... iii

RECOMMENDATION ON ORAL ARGUMENT.................................... iii

TABLE OF CONTENTS....................................................... iv

TABLE OF AUTHORITIES .................................................... v

GLOSSARY ............................................................... vii

STATUTES AND REGULATIONS .............................................1

STATEMENT OF JURISDICTION...........................................1

STATEMENT OF THE ISSUES............................................1

STATEMENT OF THE CASE...............................................2

SUMMARY OF THE ARGUMENT .........................................7

STATEMENT OF STANDING .............................................9

ARGUMENT ...............................................................12

I.   STANDARD OF REVIEW ..............................................12

II.  FAA'S DETERMINATION THAT RADICALLY SHRINKING AIRCRAFT
SEAT SIZES AND PITCH DO NOT POSE AN IMMEDIATE SAFETY
THREAT HAS NO BASIS WHATSOEVER IN THE RECORD.........................13

   A. The Petition for Rulemaking Demonstrated a Fundamental Change in Factual
   Premises Relating to the Safety Implications of Seat Size and Pitch...................14
   B. The FAA's Determination That Radically Shrunken Seat Sizes and Pitch Do
   Not Post a Safety Risk Lacks Any Support in the Record ...............................16
   C. Because the FAA's Assertions Have no Factual Support in the Record, the
   Agency's Determination Cannot Stand .................................................21

III. IN REFUSING TO CONSIDER PASSENGER HEALTH AND COMFORT,
THE AGENCY MISCONSTRUED ITS AUTHORIZING STATUTE .................25

CONCLUSION ...............................................................28

CERTIFICATE OF COMPLIANCE WITH RULE 32(A) ....................29

CERTIFICATE OF SERVICE ................................................30

# TABLE OF AUTHORITIES

## CASES

*Algonquin Gas Transmission Co. v. FERC*, 948 F.2d 1305 (D.C. Cir. 1991) ........24

*American Horse Protection Ass'n v. Ling*, 812 F.2d 1 (D.C. Cir. 1987) ......... 23, 25

*Defenders of Wildlife v. Gutierrez*, 532 F.3d 913 (D.C. Cir. 2008) ........... 10, 12, 22

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) .............................................10

*\*Massachusetts v. E.P.A.*, 549 U.S. 497 (2007) ........................................ 12, 25, 27

*McDonnell Douglas Corp. v. Dep't of the Air Force*, 375 F.3d 1182 (D.C. Cir. 2004) ..............................................................................................................23

*National Customs Brokers & Forwarders Assn. of America, Inc. v. United States*, 883 F.2d 93 (D.C. Cir. 1989) .................................................................12

*\*Safe Extensions, Inc. v. F.A.A.*, 509 F.3d 593 (D.C. Cir. 2007) .............. 12, 23, 24

*State Farm Mutual Automobile Ins. Co., v. Dep't of Transportation*, 680 F.2d 206 (D.C. Cir. 1982) ................................................................................25

*Warth v. Seldin*, 422 U.S. 490, 511 (1975) .........................................................9

*Wildearth Guardians v. U.S. Environmental Protection Agency,* 751 F.3d 649 (D.C. Cir. 2014) .......................................................................... 13, 27

*WWHT, Inc. v. FCC*, 656 F.2d 807 (D.C. Cir. 1981) ................................. 12, 13, 22

## STATUTES

49 U.S.C. § 106...................................................................................... ii, 1, 2

49 U.S.C. § 44701(a) ............................................................................ 2, 3, 26

*49 U.S.C. § 46110(a) ........................................................................ 1, 11, 12

*49 U.S.C.§ 40101(a) ......................................................................... 3, 26, 27

5 U.S.C. § 553(e) .................................................................................. ii, 1, 2

5 U.S.C. § 706(2)(A)..................................................................................12

## REGULATIONS

14 C.F.R. § 11.73 ....................................................................................1, 2

14 C.F.R. § 21.601(b) ................................................................................21

14 C.F.R. § 25.803 ....................................................................................20

14 C.F.R. § 25.807 ..................................................................................3, 15

14 C.F.R. § 25.817 ..................................................................................3, 14

14 C.F.R. § 27.785 ............................................................................. 3, 14, 15

14 C.F.R. Part 25, Appendix J ....................................................................20

**OTHER AUTHORITIES**

Associated Press, *Safety Risk of Shrinking Airline Seats Questioned*, Los Angeles
   Times (Apr. 14, 2015)......................................................................................4, 16
Daisy Carrington, *Feeling Cramped? How to battle the shrinking airline seat,*
   CNN (Nov. 11, 2013) .............................................................................................4

\* Petitioners chiefly rely on these authorities in this brief.

# GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| CFR | Code of Federal Regulations |
| FAA | Federal Aviation Administration |
| FlyersRights | Flyers Rights Education Fund d/b/a FlyersRights.org |
| JA | Joint Appendix (deferred) |
| Petition for Rulemaking | Petition for Rulemaking: Limitation of Seat Size Reductions, Submitted by FlyersRights (August 26, 2015) |

## STATUTES AND REGULATIONS

Copies of the pertinent statutes and regulations are set forth in the Addendum.

## STATEMENT OF JURISDICTION

This Court's jurisdiction rests on 49 U.S.C. § 46110(a), which provides for judicial review in this Court of orders issued by the Secretary of Transportation or the FAA Administrator.

Petitioners Flyers Rights Education Fund, Inc., d/b/a FlyersRights.org and Paul Hudson (jointly referred to as "FlyersRights") petition for review of the Federal Aviation Administration's ("FAA") February 1, 2016 order denying FlyersRights' August 26, 2015 Petition for Rulemaking: Limitation of Seat Size Reductions, submitted pursuant to § 553(e) of the Administrative Procedure Act, 49 U.S.C. § 106(3)(A) and 14 C.F.R. § 11.73.  Docket No. FAA-2015-4011, JA 170.

FlyersRights petitioned this Court for Review on March 29, 2016.  The petition is timely because it was filed within 60 days of the issuance of the order denying the rulemaking petition as prescribed by 49 U.S.C. § 46110(a).

## STATEMENT OF THE ISSUES

1. Whether the FAA's February 1, 2016 order denying Petitioners' August 26, 2015 Petition for Rulemaking is unsupported by the record and/or arbitrary, capricious or an abuse of discretion or otherwise not in accordance with law.

1

## STATEMENT OF THE CASE

This Petition seeks review of the FAA's February 1, 2016 order denying FlyersRights' August 26, 2015 Petition for Rulemaking: Limitation of Seat Size Reductions, submitted pursuant to § 553(e) of the Administrative Procedure Act 49 U.S.C. § 106 (3)(A) and 14 C.F.R. § 11.73. Docket No. FAA-2015-4011, JA 153. ("Petition for Rulemaking"). FlyersRights and Paul Hudson petitioned the FAA to: (i) Impose reasonable regulations setting maintenance standards and limiting the extent of seat changes on commercial airlines; (ii) Place a moratorium on any further reduction in seat size, width, pitch, padding, and aisle width until a final rule is issued; and (iii) appoint an advisory committee or task force to assist and advise the FAA in proposing seat and passenger space rules and standards. Docket No. FAA 2015-4011, JA 155-56. The Petition for Rulemaking contained evidence and analysis supporting the relief requested, and demonstrated that seat sizes and pitches are rapidly shrinking, which implicates the health and safety of commercial airline flyers. *Id.* In the FAA's order denying the Petition for Rulemaking, the FAA wrote that the issues identified "do not raise an immediate safety or security concern." February 1, 2016 Response at 2, JA 171.

The FAA has a statutory responsibility to "promote safe flight of civil aircraft in air commerce." 49 U.S.C. § 44701(a). It also has a responsibility, in regulating the industry, to consider a number of other factors "as being in the public interest

2

and consistent with public convenience and necessity," *id*. 49 U.S.C.§ 40101(a), including ensuring "the availability of a variety of adequate, economic, efficient and low-priced services," *id*. § 40101(a)(4) and "developing and maintaining a sound regulatory system that is *responsive to the needs of the public*." *Id*. § 40101(a)(7) (emphasis added).

Since the advent of deregulation of the airlines in 1978, the FAA has promulgated rules relating to the maximum number of seats abreast in an airliner, 14 C.F.R. § 25.817; headrests, 14 C.F.R. § 27.785; fire retardation, 14 C.F.R. Part 25, Appendix F; the minimum weight an airline seat is required to support, *id*. § 27.785; and limiting the number of seats in an aircraft based on the number and size of emergency exits.  *Id*. § 25.807.

## 1. Commercial Airlines are Reducing Seat Sizes and Pitches to Fit More Passengers on Each Airplane.

There are currently no regulations addressing seat size or pitch—*i.e*., the distance between a point on one seat to the same point on the seat in front of it. Without regulations on seat sizes and pitch, airlines have decreased seat pitch and seat width in order to fit more passengers on each plane.  Petition at 4, JA 156. The Petition for Rulemaking demonstrated a factual change in the factual premises underlying the current absence of rules governing seat size and pitch.  The Petition cited articles showing that the average seat pitch has been reduced from 35 inches to

31 inches, with some having reduced seat pitch to as low as 28 inches. Petition at 4, JA 156. Further, the width of airline seats has decreased from 18.5 inches in the early 2000's to 17 inches today. *See* Petition at 4 n.16, JA 156 (citing Daisy Carrington, *Feeling Cramped? How to battle the shrinking airline seat,* CNN (Nov. 11, 2013), http://www.cnn.com/2013/11/07/travel/feeling-cramped-battle-airline-seat/).

## 2. Safety Risks of Shrunken Seat Sizes and Pitch

The Petition points out the many safety concerns associated with decreased pitch and width—including that FAA emergency evacuation tests "do not factor in human panic, such as older passengers, passengers with children or passengers with disabilities who may need more time to evacuate. A decreased amount of space between seats would likely increase this panic and cause delays in evacuations during an emergency when time is of the essence." Petition at 6-7, JA 158-59 (internal citations omitted).

In that regard, the Petition cites a media account of an April 2015 meeting of the FAA's Advisory Committee for Aviation Consumer Protection, which noted that at that meeting, "[q]uestions were also raised if the increased density of seats means passengers won't be able to evacuate fast enough after a crash." Associated Press, *Safety Risk of Shrinking Airline Seats Questioned*, Los Angeles Times (Apr. 14, 2015), http://www.latimes.com/business/la-fi-airline-seat-risks-20150414-story.html, cited at

4

Petition at 6 n.28, JA 158. As the Petition notes, according to that article, at that meeting, one of the FAA's own researchers stated that the FAA has not required emergency evacuation demonstrations with seat pitches under 31 inches, "even though aircraft are operating with seat pitches as low as 28 inches." *Id*., JA 158.

### 3. The FAA's Denial of the Petition for Rulemaking and Subsequent Response

In response to the Petition's assertions that radically shrinking seat width and pitch pose a safety threat, the FAA issued an order denying the Petition for Rulemaking, stating the issues raised "do not raise an immediate safety or security concern." FAA Feb. 1 Response at 2, JA 171. This denial was based on two key factual assertions: (i) that demonstrations have actually been conducted that "have interior configurations that are more critical (less seat pitch and higher number of passengers) than most configurations operated by the airlines;" and (ii) that "[f]ull scale evacuation tests on widely used airplanes have been successfully conducted at 28-pitch and 29-inch pitch, when substantiating the maximum occupancy." FAA Feb. 1 Response at 2, JA 171.

FlyersRights responded on February 21, 2016, requesting the studies or tests that the FAA had alluded to—but did not cite—in support of its assertion that shrunken seats and leg room do not pose a safety or health risk. Letter from Paul Hudson to Dorenda Baker, Feb. 21, 2016 at 1, JA 173.

On March 14, 2016, Ms. Baker replied, stating, "[m]ultiple manufacturers have performed evacuation demonstrations below 30-inch seat pitch, down to 28-inch seat pitch.  The extensive data we have indicates seat pitch and width does not adversely affect evacuation times.  As requested, references regarding seat and evacuation studies, as well as potential health issues are enclosed."  Letter from Dorenda Baker to Paul Hudson, Mar. 14, 2016, JA 175.

None of the three FAA studies provided to petitioner, and relied on by the agency, report on the results of any evacuation test conducted with seat configurations of any specified width or seat pitch.  Rather, the studies focused primarily on exit row seating.  The first Access-to-Egress Study, Certified Record Doc. #19, JA 179, measured the effects only of variations in the size of the passageway in the exit row, leading from the center aisle to the exit window, and in the configuration of the seats in the exit row, in front of the exit window.  The second study, Certified Record Doc. # 18, JA 179, "Access to Egress II," compared the rates and types of injuries that would be experienced by passengers given different configurations of the passageway in front of the exit row.  Again there were no indications at to what seat sizes or pitches were involved in any of the evacuation trials summarized in the study.  Finally, the most recent study (albeit 12 years old), "Access to Egress III," Certified Record Doc. #17, JA 178, measured the effects on evacuation times of a number of factors including exit row seating, passageway

6

configurations, and different attributes of passengers, such as gender and waist size. None of those factors, however, had anything to do with the size or pitch of all of the other seats in the airplane.

### 4. Public Comments to Petition for Rulemaking

More than 140 comments were submitted in this rulemaking petition docket. Certified Administrative Record Appendix A, JA 179. In those comments, members of the public recounted numerous examples of extreme discomfort and health issues caused by the shrinkage in seat size and pitch, including, for example, a passenger with carpal tunnel syndrome whose arms were numb for an entire flight due to lack of space to extend them (JA 169); a passenger who had to climb onto her seat to access the restroom (JA 167); a passenger who is susceptible to blood clots and found it increasingly difficult to walk the aisles during flight (JA 168); and a 6 foot, 2 inches tall passenger who explained it was physically impossible for him to assume the "crash position" on any U.S. carrier's plane in a regular coach seat. (JA at 166).

### SUMMARY OF THE ARGUMENT

Although the scope of this Court's review of a denial of petition for rulemaking is limited and deferential, the Court must still satisfy itself that the agency has adequately explained the policy concerns and facts relied upon and that those facts have some basis in the record. That standard has not been met in this case for two reasons.

First, a compelling cause for overturning an agency's refusal to initiate a rulemaking is a fundamental change in the factual premises previously considered by the agency. In this case, the airlines' radical shrinkage of seat sizes and pitch, which affects leg room, in recent years is a fundamental change in the factual premises underlying the absence of any rule governing such sizes and pitch, and one raising an immediate safety concern about the ability of passengers to move out of their seats quickly in case of an emergency. Petitioners brought to FAA's attention the fact that the FAA has never required the airlines to conduct emergency evacuation tests with the smallest seat sizes and pitches used in the actual configuration of some aircraft.

The agency's response, declining to initiate rulemaking, asserted that such tests had been conducted and cited three FAA reports and four FAA Advisory Circulars—materials constituting the entire factual basis the agency claims supports its assertion. *None* of those materials, however, in any way indicates that any evacuation test has ever been conducted in an aircraft with the smallest seat sizes and pitch currently in use on actual aircraft. To the contrary, the FAA's own guidance indicates that evacuation tests need not be conducted using the actual seat configuration in use on any aircraft and one of the FAA's own researchers has stated no evacuation tests have been conducted in aircraft with the smallest seat sizes and pitch now in use. In addition, the reports cited by the FAA were completed in 2001

8

through 2004, prior to the decrease in seat width and pitch that occurred during the last decade.

Second, the FAA indicated that it would decline to consider the rulemaking Petition to the extent it merely raised issues of passenger health and comfort. The FAA believed that it was free to ignore concerns about passenger health and comfort, including more than 140 public comments raising these issues, as well as safety concerns, none of which was even acknowledged in FAA's decision declining to initiate a rulemaking. That belief was mistaken as a matter of law. The agency misinterpreted the scope of its own statutory mandate, which goes beyond safety to include regulating the industry in a way that is responsive to the needs of the public. For that reason, also, the FAA's refusal to initiate a rulemaking should be overturned.

### STATEMENT OF STANDING

Petitioners FlyersRights and Paul Hudson are adversely affected and substantially aggrieved by the FAA's order and have the necessary standing to challenge the FAA order. As the Supreme Court has long recognized, an organization "may have standing in its own right to seek judicial relief from an injury to itself." *Warth v. Seldin*, 422 U.S. 490, 511 (1975). To establish standing, a party must show that it has suffered an injury-in-fact, i.e., a concrete, and particularized, actual or imminent invasion of a legally protected interest; that the injury is fairly

9

traceable to the challenged action of the defendant; and that a favorable decision will likely redress the injury. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

FlyersRights is a non-profit organization that works to advocate for the interests of airline passengers. FlyersRights has standing as an organization because its member, Paul Hudson, has standing to sue in his own right, the interests at stake are germane to FlyersRights' purpose, and Petitioners submitted the Rulemaking Petition to the FAA requesting that the moratorium on the reduction in seat sizes and pitches.

Here, Mr. Hudson, a member and President of FlyersRights, has a substantial interest and has suffered an injury sufficient to demonstrate standing. *See* Declaration of Paul Hudson ("Hudson Decl."), Ex. 1, JA 181. Mr. Hudson frequently flies on commercial airlines, and averages about 15-20 flights per year. Hudson Decl. ¶ 8, JA 182. Mr. Hudson is concerned that in the case of an emergency on a flight, he will not be able to evacuate the plane since evacuation tests have not been run on aircrafts with seat pitches under 31 inches. Hudson Decl. ¶ 12, JA 182. It makes him hesitant to fly on commercial airlines, however, his job requires that he still does. Hudson Decl. ¶ 13, JA 183. He is also concerned that any further reduction in the size and pitch of airline seats may cause him to develop Deep Vein Thrombosis while flying commercially, because his height and medical conditions

10

make it difficult to move about the cabin and perform leg exercises while seated. Hudson Decl. ¶¶ 9-11, JA 182.

Mr. Hudson believes that without a moratorium on limiting seat sizes, airlines will continue to reduce seat sizes and any further reduction in seat size and pitch may make flying commercial even more difficult or impossible for him, which may impede on his ability to do his job.  Hudson Decl. ¶¶ 14-15, JA 183.

For these reasons, FlyersRights and Mr. Hudson submitted the Petition for Rulemaking to the FAA to place a moratorium on any further reduction of seat sizes on commercial airlines.  Hudson Decl. ¶ 6.  Mr. Hudson's injuries, and those of FlyersRights' members, are caused by the FAA's failure to place a moratorium on the continued reduction of seat sizes and pitches.  This failure allows commercial airlines to continually reduce seat sizes and pitches.  Hudson Decl. ¶ 16.  The requested relief would redress Mr. Hudson's injury by placing a moratorium on the airlines' reduction of seat sizes until the safety risks can be properly reviewed.

Because Mr. Hudson, a member of FlyersRights, has standing to bring this action in his own right, and the interests at stake are germane to FlyersRights' purpose, Petitioners have standing to bring this action.

In addition, these same interests show that Petitioners have prudential standing.  *See* 49 U.S.C § 46110(a) (a "person disclosing a substantial interest in an order issued by the . . . Federal Aviation Administration . . . may apply for review of

the order by filing a petition for review in the United States Court of Appeals for the District of Columbia Circuit . . . ."); *Safe Extensions, Inc. v. F.A.A.*, 509 F.3d 593, 600 (D.C. Cir. 2007) (49 U.S.C. § 46110(a) establishes standard for prudential standing).

## ARGUMENT

### I.    STANDARD OF REVIEW

The FAA's denial of a petition for rulemaking is reviewable under Section 706(2)(A) of the Administrative Procedure Act ("APA").  *Safe Extensions, Inc. v. F.A.A.*, 509 F.3d 593, 604 (D.C. Cir. 2007).  Refusals to promulgate rules are "susceptible to judicial review, though such review is extremely limited and highly deferential." *Massachusetts v. E.P.A.*, 549 U.S. 497, 527-28 (2007) (citing *National Customs Brokers & Forwarders Assn. of America, Inc. v. United States*, 883 F.2d 93, 96 (D.C. Cir. 1989).

"Where . . . 'the proposed rule pertains to a matter of policy within the agency's expertise and discretion, the scope of review should "perforce be a narrow one, limited to ensuring that the [agency] has adequately explained the facts and policy concerns it relied on and to satisfy ourselves that those facts have some basis in the record."'" *Defenders of Wildlife v. Gutierrez*, 532 F.3d 913, 919 (D.C. Cir. 2008) (quoting *WWHT, Inc. v. FCC*, 656 F.2d 807, 817 (D.C. Cir. 1981) (internal citations omitted).  "In other words, [the Court] look[s] to see whether the agency

employed reasoned decision making in rejecting the petition." *Id*.  Generally, the Court "'will overturn an agency's decision not to initiate a rulemaking only for compelling cause, such as plain error of law or a fundamental change in the factual premises previously considered by the agency.'"  *Wildearth Guardians v. U.S. Environmental Protection Agency,* 751 F.3d 649, 653 (D.C. Cir. 2014) (quoting *Nat'l Customs Brokers & Forwarders Ass'n*, 883 F.2d at 96-97).

Under the FAA's regulations, the agency is to consider three factors in determining whether to initiate a rulemaking in response to a petition: "(1) The immediacy of the safety or security concerns you raise; (2) The priority of other issues the FAA must deal with; and (3) The resources we have available to address those issues."  14 C.F.R. §11.73(a).

## II.  FAA'S DETERMINATION THAT RADICALLY SHRINKING AIRCRAFT SEAT SIZES AND PITCH DO NOT POSE AN IMMEDIATE SAFETY THREAT HAS NO BASIS WHATSOEVER IN THE RECORD

An "agency may be forced by a reviewing court to institute rulemaking proceedings if a significant factual predicate of a prior decision on the subject (either to promulgate or not to promulgate specific rules) has been removed."  *WWHT, Inc.*, 656 F.2d at 819.  In this case, FlyersRights, in its Petition for Rulemaking, demonstrated to the FAA that there has been "a fundamental change in the factual premises" underlying the current absence of any rule governing seat size or spacing.

13

This fundamental change is, namely, a radical reduction of seat size and pitch. That reduction makes it difficult for passengers to exit the seats and poses a serious safety risk, for which no testing has been done for the most cramped seating. The FAA determined that the facts presented in the Petition "do not raise an immediate safety or security concern." Letter from Dorenda Baker, FAA, to Paul Hudson, FlyersRights, Feb. 1, 2016 ("FAA Feb. 1 Response") p. 2, JA 171. The FAA's determination is based on the assertion that evacuation tests have been conducted on aircraft with the shortest seat sizes and pitches in use today, at maximum occupancy. But that assertion is completely unsupported by the record. In fact, not only does the record not contain any evidence of any such test having been conducted, but the FAA's own guidelines for emergency evacuation demonstrations make clear that the airlines are not required to use their actual seat configurations in conducting these demonstrations.

## A. The Petition for Rulemaking Demonstrated a Fundamental Change in Factual Premises Relating to the Safety Implications of Seat Size and Pitch

As the Petition for Rulemaking explains, since the advent of deregulation of the airlines in 1978, the FAA has promulgated rules relating to the maximum number of seats abreast in an airliner, 14 C.F.R. § 25.817; headrests, 14 C.F.R. § 27.785; fire retardation, 14 C.F.R. Part 25, Appendix F; the minimum weight an airline seat is

14

required to support, *id*. § 27.785; and limiting the number of seats in an aircraft based on the number and size of emergency exits, *id*. § 25.807. There is currently no regulation addressing seat size or pitch. Petition at 3, JA 155.

The Petition for Rulemaking demonstrated a "fundamental change in the factual premises" underlying the current absence of any rule governing seat size and pitch. The Petition points out that "airlines have decreased seat pitch and seat width in order to fit more passengers on each plane." Petition at 3, JA 155. The Petition cites articles showing that seat width has decreased from 18.5 inches in the early 2000's, to 17 inches or less today. *Id*. at 4, JA 156. The Petition notes that average seat pitch has been reduced from 35 inches (prior to deregulation) to 31 inches, and that some airlines have reduced seat pitch to as low as 28 inches. *Id*., JA 156 & nn. 14 & 15.

The Petition points out that FAA emergency evacuation tests "do not factor in human panic, such as older passengers, passengers with children or passengers with disabilities who may need more time to evacuate. A decreased amount of space between seats would likely increase this panic and cause delays in evacuations during an emergency when time is of the essence." Petition at 6-7, JA 158-59.

In that regard, the Petition cites a media account of an April 2015 meeting of the FAA's Advisory Committee for Aviation Consumer Protection, which noted that at that meeting, "[q]uestions were also raised if the increased density of seats means

15

passengers won't be able to evacuate fast enough after a crash."  Associated Press, *Safety Risk of Shrinking Airline Seats Questioned*, Los Angeles Times (Apr. 14, 2015), http://www.latimes.com/business/la-fi-airline-seat-risks-20150414-story.html [hereinafter *Safety Risk*], JA 150, cited at Petition at 6 n.28, JA 158.  As the Petition notes, according to that article, at that meeting, an FAA researcher stated that the FAA has not required emergency evacuation demonstrations with seat pitches under 31 inches, "even though aircraft are operating with seat pitches as low as 28 inches."  Petition at 6, JA 158.  That article reports that:

> The Federal Aviation Administration runs various tests including how fast passengers can evacuate a plane and how fast they can put on a life preserver. But Cynthia Corbertt, a human factors researcher, with the FAA, testified that it conducts those tests using planes with 31 inches between each row of seats. Many passenger jets today have less legroom.  For instance, United Airlines has 30 inches of room, known as pitch, on some jets; Spirit Airlines offers 28 inches.  "We just haven't considered other pitches," Corbett told the Advisory Committee for Aviation Consumer Protection.

*Safety Risk*, *supra*, JA 150.

Thus, the Petition demonstrated a fundamental change in the factual premises—namely, the assumptions about seat size and width underlying the current absence of any FAA rule governing seat sizes or pitch.

## B. The FAA's Determination That Radically Shrunken Seat Sizes and Pitch Do Not Post a Safety Risk Lacks Any Support in the Record

16

The FAA's response to the Petition was that the issues identified "do not raise an immediate safety or security concern."  FAA Feb. 1 Response at 2, JA 171.  The Response asserts that emergency evacuation demonstrations required to have been conducted by the FAA "have interior configurations that are more critical (less seat pitch and higher number of passenger) than most configurations operated by the airlines."  *Id*.  The Response goes on to assert that:

> Your letter also states that tests have not been run with seat pitch below 31 inches.  This is also not the case.  Full scale evacuation tests on widely used airplanes have been successfully conducted at 28-and 29-inch pitch, when substantiating the maximum occupancy.

*Id.*

FlyersRights wrote a follow-up letter on February 21, 2016, asking, "what studies or tests that you allude to but do not cite are you relying on for your conclusions that shrunken seats and leg room do not pose a safety or health risk?" Letter from Paul Hudson to Dorenda Baker, Feb. 21, 2016 at 1, JA 173.  On March 14, 2016, Ms. Baker responded, stating, "[m]ultiple manufacturers have performed evacuation demonstrations below 30-inch seat pitch, down to 28-inch seat pitch.  The extensive data we have indicates seat pitch and width does not adversely affect evacuation times.  As requested, references regarding seat and evacuation studies, as well as potential health issues are enclosed."  Letter from Dorenda Baker to Paul Hudson, Mar. 14, 2016, JA 175.  The letter set out a "List of References," all of which have been included by the agency in the certified administrative record in this

17

case.  Certification of Index to Administrative Record, Doc. #1613307, filed May 16, 2016, JA 177-79.

The references included in the list sent to FlyersRights and in the Certified Administrative Record, insofar as they pertain to safety issues, include three FAA reports and four FAA Advisory Circulars, as follows:

| Certified Admin. Record Doc. # | Name | Appendix |
|---|---|---|
| 10 | FAA Advisory Circular 25.803-1A—Emergency Evacuation Demonstrations | |
| 13 | FAA Advisory Circular 25-17A—Transport Airplane Cabin Interiors Crashworthiness Handbook | (excerpts) |
| 15 | FAA Advisory Circular 25.562-1B with Change 1—Dynamic Evaluation of Seat Restraint Systems and Occupant Protection on Transport Airplanes | |
| 17 | FAA Report—Access to Egress III: Repeated Measurement of Factors That Control the Emergency Evacuation of Passengers Through the Transport Airplane Type-III Overwing Exit | |
| 18 | FAA Report—Access to Egress II—Subject Management and Injuries in a Study of Emergency Evacuation Through the Type -III Exit | |
| 19 | FAA Report—Access to Egress: A Meta-Analysis of the Factors That Control Emergency Evacuation Through the Transport Airplane Type-III Overwing Exit | |
| 23 | FAA Advisory Circular 21-22—Injury Criteria for Human Exposure to Impact | |

18

*None* of the three FAA studies relied on by the agency contain results of *any* evacuation test conducted with seat configurations of any specified width or seat pitch. The first Access-to-Egress Study, Certified Record Doc. #19, JA 001, measured the effects only of variations in the size of the passageway in the exit row, leading from the center aisle to the exit window, and in the configuration of the seats in the exit row, in front of the exit window. The second study, Certified Record Doc. #18, JA 033, "Access to Egress II," compared the rates and types of injuries that would be experienced by passengers given different configurations of the passageway in front of the exit row. There were no indications of what seat sizes or pitches were involved in any of the evacuation trials summarized in the study. Finally, the most recent study, from 2004, "Access to Egress III," Certified Record Doc. #17, JA 069, measured the effects on evacuation times of a number of factors including exit row seating and passageway configurations, and different attributes of passengers (gender, waist size). None of those factors studied, however, had anything whatsoever to do with the size or pitch of the seats not in the exit rows of the airplane. These studies therefore do not support the conclusory assertions of the agency that "Multiple manufacturers have performed evacuation demonstrations below 30-inch seat pitch, down to 28-inch seat pitch" or that "[t]he extensive data we have indicates seat pitch and width does not adversely affect evacuation times." Letter from Dorenda Baker to Paul Hudson, Mar. 14, 2016, JA 175.

19

There are also four FAA circulars included in the Certified Administrative Record (Docs. # 10, #13, #15, #23). Three of them—Documents 13, 15, and 23—have nothing whatsoever to do with emergency evacuation demonstrations conducted on aircraft with specified seat configurations. The fourth—Document 10, FAA Advisory Circular 25.803-1A, JA 121—is highly relevant, but actually contradicts the FAA's assertion in it response to the Petition for Rulemaking.

Contrary to common belief, the FAA does not conduct evacuation demonstrations on different models of aircraft; rather, the agency lets the airlines either conduct their own demonstrations, in accordance with test criteria specified by FAA, or use analyses or tests in lieu of conducting an actual demonstration. 14 C.F.R. § 25.803(c). The FAA regulation requires that "the maximum seating capacity, including the number of crewmembers required by the operating rules for which certification is requested, can be evacuated from the airplane to the ground under simulated emergency conditions within 90 seconds." *Id*. The FAA test criteria are set out in FAA's regulations, 14 C.F.R. Part 25, Appendix J. Appendix J, however, does not in any way address seat size or pitch.

FAA Advisory Circular 25.803-1A, Certified Record Doc. #10, JA 121, provides additional detailed guidance to air carriers on the conduct of evacuation demonstrations or use of analysis in lieu of demonstrations. With respect to seat size and configuration, the Circular states:

20

> The airplane should be configured with the minimum aisle, crossaisle, and passageway clearances expected to be type certificated. . . . This may require combining features of more than one interior configuration. *The airplane interior need not be representative of a specific operational configuration for purposes of the demonstration.* For example, galleys and other furnishing may be simulated by mockups; *seats need not have a Technical Standard Order (TSO) authorization*, etc.

FAA Advisory Circular 25.803-1A § 8(a)(5) at 8, JA 128 (emphasis added).

By stating that in an evacuation demonstration, the seats do not require a TSO authorization, the FAA is confirming that the aircraft configuration used for the demonstration does not have even have to be equipped with *any* actual seat type that could lawfully be manufactured for use in U.S. aircraft—let alone seats of a specified size or pitch. A "Technical Standard Order" ("TSO") is a "minimum performance standard for specified articles used on civil aircraft." 14 C.F.R. § 21.601(b)(1). A TSO authorization "is an FAA design and production approval issued to the manufacturer of an article that has been found to meet a specific TSO." *Id*. § 21.601(b)(2). It is unlawful to install on an aircraft a part for which a TSO has been issued, that does not meet that TSO.

### C. Because the FAA's Assertions Have no Factual Support in the Record, the Agency's Determination Cannot Stand

In response to the Petition's assertions that radically shrinking seat sizes and pitch pose a safety threat, the FAA concluded that the issues raised "do not raise an

immediate safety or security concern" based on two key factual assertions: (i) that demonstrations have actually been conducted that "have interior configurations that are more critical (less seat pitch and higher number of passengers) than most configurations operated by the airlines;" and (ii) that "[f]ull scale evacuation tests on widely used airplanes have been successfully conducted at 28-pitch and 29-inch pitch, when substantiating the maximum occupancy."  FAA Feb. 1 Response at 2, JA 171.  The FAA relied on these two factual assertions in determining that the seat size and pitch issues do not raise an immediate safety concern.  Those facts must "have some basis in the record."  *Defenders of Wildlife v. Gutierrez*, 532 F.3d at 919 (citing *WWHT, Inc. v. FCC*, 656 F.2d 807, 817 (D.C.Cir.1981)).

As shown above, however, there is not a single word in the Certified Administrative Record that supports the FAA's two propositions.  In fact, the one relevant document in the record, the Advisory Circular on emergency evacuation, states that the airlines are *not* required to conduct evacuation tests using seats of *any* particular size or pitch.  And the FAA's factual assertions are also contradicted by external evidence: the FAA's own employee, Cynthia Corbett, who stated at a public meeting of an official FAA body that the agency has not conducted or received results of evacuation testing of aircraft with seat pitches below 31 inches.  JA 150.  In the circumstances presented here—where there is absolutely no factual support in

the record and contradictory evidence both in and outside the record—the agency's determination cannot stand.

In *American Horse Protection Ass'n v. Ling*, 812 F.2d 1 (D.C. Cir. 1987), the agency's determination to refuse to proceed with rulemaking was based on a conclusory factual assertion rejecting the argument that a then-recent study presented new facts meriting a rulemaking. The Court found that the agency's "post hoc conclusory statement lack[ed] substance;" and that it was contradicted by other evidence external to the record. *Id*. at 6. The Court concluded that the agency "has not presented a reasonable explanation of [its] failure to grant the rulemaking petition…" *Id*. at 7.

In *Safe Extensions, Inc. v. F.A.A.*, 509 F.3d 593 (D.C. Cir. 2007), the FAA issued a circular requiring certain testing of one type airport runway light base ("adjustable" bases) but not another ("fixed" bases). The FAA offered the rationale that it had more experience with fixed products, justifying its determination to subject the adjustable products to more rigorous tests. The Court found, however, that "the FAA has provided absolutely no evidence to back it up, and . . . an agency's 'declaration of fact that is capable of exact proof but is unsupported by any evidence' is insufficient to make the agency's decision non-arbitrary." 509 F.3d at 605 (quoting *McDonnell Douglas Corp. v. Dep't of the Air Force*, 375 F.3d 1182, 1191 n.4 (D.C. Cir. 2004)). The FAA further contended that its position was justified by

23

the fact that the adjustable products were not configured with certain stability devices—a fact the petitioner contested.  The Court rejected the FAA's factual contention because it had no support in the record: "The FAA . . . has provided no documents, drawings or affidavits to support this claim, . . . As we have said many times before, '[a]n agency's unsupported assertion does not amount to substantial evidence.'"  *Id*. at 605 (quoting *Algonquin Gas Transmission Co. v. FERC*, 948 F.2d 1305, 1313 (D.C. Cir. 1991)).  In summary, the Court concluded, because the FAA's decision "finds no support in the evidence the agency considered, we find it arbitrary and capricious."  *Id*. at 606.

In this case, too, the FAA's decision that there is no safety threat, because aircraft evacuation tests have been conducted with today's narrowest seat sizes and smallest pitches, finds absolutely no support in the evidence the agency considered.  Nowhere in the Certified Administrative Record is there a shred of evidence that *any* actual evacuation test has ever been conducted with seat sizes of 17 inches or less or seat pitches of less than 31 inches.  Indeed, as noted, to the extent the evidence of record addresses the issue, it indicates that such tests do not even need to be conducted with the actual seats installed in the actual aircraft used by the carriers to transport passengers.

In these circumstances, the Petition demonstrated a fundamental change in factual premises—a change indicating an immediate safety threat—underlying the

24

current absence of seat size and pitch minimum standards, and the agency's response is completely unsupported by any facts in the record.    In these exceptional circumstances, the FAA should be compelled to initiate a rulemaking proceeding as requested in the Petition, to issue regulations setting standards and limiting the extent of seat size and pitch changes.

III.    **IN REFUSING TO CONSIDER PASSENGER HEALTH AND COMFORT, THE AGENCY MISCONSTRUED ITS AUTHORIZING STATUTE**

Refusal to initiate rulemaking proceedings should be set aside by the reviewing court when that refusal is based on an incorrect interpretation by the agency of its own statutory authority.  *See Massachusetts v. EPA*, 549 U.S. 497, 528 (2007).  This Court has recognized that the rare circumstances in which a refusal to institute rulemaking have been overturned "have primarily involved 'plain errors of law, suggesting that the agency has been blind to the source of its delegated power, . . .'"  *American Horse Protection Ass'n*, 812 F.2d at 5 (quoting *State Farm Mutual Automobile Ins. Co., v. Dep't of Transportation*, 680 F.2d 206, 221 (D.C. Cir. 1982), *vacated on other grounds*, 463 U.S. 29 (1983)).

In this case, the FAA rejected the Petition in part because it viewed the issues raised as related to passenger health and comfort, not an immediate safety or security concern.  Feb. 1 Response at 2, JA 171.  The agency did not respond to the Petition's

25

contentions about the extreme discomfort suffered by passengers as a result of the airlines' radical reductions in seat sizes and pitch—for example, the fact that due to Americans getting heavier and taller while seat sizes have been shrinking, "about half of male passengers are larger than the width of a coach seat." Petition at 4, JA __. And, although the FAA responded to the Petition's assertions about the effect of seat size and pitch on deep vein thrombosis, the agency did not acknowledge or respond to the other health-related concerns raised, including soreness, stiffness, joint and muscle problems (*id*. at 6, JA 158), and lack of mobility for older and disabled passengers. *Id*., JA 158.

To the extent that the FAA refused to consider passenger comfort and health issues because it interpreted its own statutory mandate to be limited to safety concerns, the agency has misinterpreted the scope of its own statutory responsibility and authority. To be sure, the FAA has a statutory responsibility to "promote safe flight of civil aircraft in air commerce." 49 U.S.C. § 44701(a). But it also has a responsibility, in regulating the industry, to consider a number of other factors "as being in the public interest and consistent with public convenience and necessity," *id*. § 40101(a), including ensuring "the availability of a variety of adequate, economic, efficient and low-priced services," *id*. § 40101(a)(4) and "developing and maintaining a sound regulatory system that is *responsive to the needs of the public*." *Id*. § 40101(a)(7) (emphasis added).

26

Here, the FAA believed, incorrectly, that it was not legally obligated even to consider the "needs of the public" with respect to passenger health and safety—as demonstrated, among other things, by more than 140 comments submitted in this rulemaking petition docket.  Certified Administrative Record Appendix A, JA 179. In those comments, members of the public recounted numerous examples of extreme discomfort and health issues caused by the shrinkage in seat size and pitch, including, for example, a passenger with carpal tunnel syndrome whose arms were numb for an entire flight due to lack of space to extend them (JA 169); a passenger who had to climb onto her seat to access the restroom (JA 167); a passenger who is susceptible to blood clots and found it increasingly difficult to walk the aisles during flight (JA 168); and a 6 foot, 2 inches tall passenger who explained it was physically impossible for him to assume the "crash position" on any U.S. carrier's plane in a regular coach seat.  (JA at 166).

The FAA's decision to dismiss, out of hand, all of the passenger comfort and health concerns raised in the Petition and the comments is a refusal "to comply with a "clear statutory command," *Massachusetts v. EPA*, 549 U.S. at 533, that the agency regulate air carriers in a way that is "responsive to the needs of the public," 49 U.S.C. § 40101(a)(7).  In this way, the agency's refusal to initiate a rulemaking proceeding was based upon a "plain error of law," *Wildearth Guardians*, 751 F.3d 649, 653

(D.C. Cir. 2014).  For this reason, also, the FAA's refusal to initiate rulemaking should be overturned.

## CONCLUSION

For the reasons set forth above, the Petition for Review should be granted and the FAA's decision not to institute a rulemaking should be reversed and remanded with instructions to institute a new rulemaking.

Respectfully Submitted,


/s/ Joseph E. Sandler

Joseph E. Sandler
Sandler Reiff Lamb Rosenstein & Birkenstock P.C.
1025 Vermont Ave N.W. Suite 300
Washington, D.C. 20005
(202) 479-1111
Sandler@sandlerreiff.com
Counsel for Petitioners

Dated: November 18, 2016

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

I hereby certify that the foregoing brief complies with the length limitation of

Fed. R. App. P. 32(a)(7)(A) because the principal brief contains 28 pages.

/s/ Joseph E. Sandler
Joseph E. Sandler
Counsel for Petitioners

Dated: November 18, 2016

## CERTIFICATE OF SERVICE

I, Joseph E. Sandler, hereby certify that on this 18th day of November 2016, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the D.C. Circuit by using the CM/ECF system. The following participants in this case who are registered CM/ECF users will be served by the CM/ECF system:

Karen Schoen
Mark B. Stern
U.S. Department of Justice
950 Pennsylvania Ave N.W.
Washington, D.C. 20530
Tel. (202) 514-3159
Karen.a.schoen@usdoj.gov
Mark.Stern@usdoj.gov
Attorneys for Respondents


I also certify that on the same day I caused eight paper copies of the foregoing document to be mailed via United States mail, postage prepaid, to the Clerk of the Court, addressed as follows:

      Clerk of the Court
      United States Court of Appeals for the District of Columbia Circuit
      E. Barrett Prettyman United States Courthouse
      333 Constitution Avenue, N.W.


I further certify that on the same day, I caused two copies of the foregoing document to be served on counsel of record for Respondents by mailing them via United States Mail, postage prepaid, to the address listed above.


                   /s/ Joseph E. Sandler
                   Joseph E. Sandler

                   Counsel for Petitioners

## STATUTORY AND REGULATORY ADDENDUM

### STATUTES

49 U.S.C. § 106 ...........................................................................................1

49 U.S.C. § 40101 .......................................................................................1

49 U.S.C. § 44701 .......................................................................................3

49 U.S.C. § 46110 .......................................................................................5

5 U.S.C. § 553 .............................................................................................5

5 U.S.C. § 706 .............................................................................................6

### REGULATIONS

14 C.F.R. § 11.73 ........................................................................................6

14 C.F.R. § 21.601 ......................................................................................7

14 C.F.R. § 25.803 ......................................................................................8

14 C.F.R. § 25.807 ......................................................................................8

14 C.F.R. § 25.817 ......................................................................................12

14 C.F.R. § 27.785 ......................................................................................12

14 C.F.R. Pt. 25, App. J .............................................................................14

**STATUTES**

## 49 U.S.C. § 106(f)(3)(A)
## § 106. Federal Aviation Administration

**(3) Regulations.--**
**(A) In general.**--In the performance of the functions of the Administrator and the Administration, the Administrator is authorized to issue, rescind, and revise such regulations as are necessary to carry out those functions. The issuance of such regulations shall be governed by the provisions of chapter 5 of title 5. The Administrator shall act upon all petitions for rulemaking no later than 6 months after the date such petitions are filed by dismissing such petitions, by informing the petitioner of an intention to dismiss, or by issuing a notice of proposed rulemaking or advanced notice of proposed rulemaking. The Administrator shall issue a final regulation, or take other final action, not later than 16 months after the last day of the public comment period for the regulations or, in the case of an advanced notice of proposed rulemaking, if issued, not later than 24 months after the date of publication in the Federal Register of notice of the proposed rulemaking. On February 1 and August 1 of each year the Administrator shall submit to the Committee on Transportation and Infrastructure of the House of Representatives and the Committee on Commerce, Science, and Transportation of the Senate a letter listing each deadline the Administrator missed under this subparagraph during the 6-month period ending on such date, including an explanation for missing the deadline and a projected date on which the action that was subject to the deadline will be taken.

## 49 U.S.C. § 40101
## § 40101. Policy

**(a) Economic regulation.**--In carrying out subpart II of this part and those provisions of subpart IV applicable in carrying out subpart II, the Secretary of Transportation shall consider the following matters, among others, as being in the public interest and consistent with public convenience and necessity:
**(1)** assigning and maintaining safety as the highest priority in air commerce.
**(2)** before authorizing new air transportation services, evaluating the safety implications of those services.
**(3)** preventing deterioration in established safety procedures, recognizing the clear intent, encouragement, and dedication of Congress to further the highest degree of safety in air transportation and air commerce, and to maintain the safety vigilance

that has evolved in air transportation and air commerce and has come to be expected by the traveling and shipping public.

(**4**) the availability of a variety of adequate, economic, efficient, and low-priced services without unreasonable discrimination or unfair or deceptive practices.

(**5**) coordinating transportation by, and improving relations among, air carriers, and encouraging fair wages and working conditions.

(**6**) placing maximum reliance on competitive market forces and on actual and potential competition--

(**A**) to provide the needed air transportation system; and

(**B**) to encourage efficient and well-managed air carriers to earn adequate profits and attract capital, considering any material differences between interstate air transportation and foreign air transportation.

(**7**) developing and maintaining a sound regulatory system that is responsive to the needs of the public and in which decisions are reached promptly to make it easier to adapt the air transportation system to the present and future needs of--

(**A**) the commerce of the United States;

(**B**) the United States Postal Service; and

(**C**) the national defense.

(**8**) encouraging air transportation at major urban areas through secondary or satellite airports if consistent with regional airport plans of regional and local authorities, and if endorsed by appropriate State authorities--

(**A**) encouraging the transportation by air carriers that provide, in a specific market, transportation exclusively at those airports; and

(**B**) fostering an environment that allows those carriers to establish themselves and develop secondary or satellite airport services.

(**9**) preventing unfair, deceptive, predatory, or anticompetitive practices in air transportation.

(**10**) avoiding unreasonable industry concentration, excessive market domination, monopoly powers, and other conditions that would tend to allow at least one air carrier or foreign air carrier unreasonably to increase prices, reduce services, or exclude competition in air transportation.

(**11**) maintaining a complete and convenient system of continuous scheduled interstate air transportation for small communities and isolated areas with direct financial assistance from the United States Government when appropriate.

(**12**) encouraging, developing, and maintaining an air transportation system relying on actual and potential competition--

(**A**) to provide efficiency, innovation, and low prices; and

(**B**) to decide on the variety and quality of, and determine prices for, air transportation services.

Add. 2

**(13)** encouraging entry into air transportation markets by new and existing air carriers and the continued strengthening of small air carriers to ensure a more effective and competitive airline industry.

**(14)** promoting, encouraging, and developing civil aeronautics and a viable, privately-owned United States air transport industry.

**(15)** strengthening the competitive position of air carriers to at least ensure equality with foreign air carriers, including the attainment of the opportunity for air carriers to maintain and increase their profitability in foreign air transportation.

**(16)** ensuring that consumers in all regions of the United States, including those in small communities and rural and remote areas, have access to affordable, regularly scheduled air service.

## 49 U.S.C. § 44701
## § 44701. General requirements

**(a) Promoting safety.**--The Administrator of the Federal Aviation Administration shall promote safe flight of civil aircraft in air commerce by prescribing--

**(1)** minimum standards required in the interest of safety for appliances and for the design, material, construction, quality of work, and performance of aircraft, aircraft engines, and propellers;

**(2)** regulations and minimum standards in the interest of safety for--

**(A)** inspecting, servicing, and overhauling aircraft, aircraft engines, propellers, and appliances;

**(B)** equipment and facilities for, and the timing and manner of, the inspecting, servicing, and overhauling; and

**(C)** a qualified private person, instead of an officer or employee of the Administration, to examine and report on the inspecting, servicing, and overhauling;

**(3)** regulations required in the interest of safety for the reserve supply of aircraft, aircraft engines, propellers, appliances, and aircraft fuel and oil, including the reserve supply of fuel and oil carried in flight;

**(4)** regulations in the interest of safety for the maximum hours or periods of service of airmen and other employees of air carriers; and

**(5)** regulations and minimum standards for other practices, methods, and procedure the Administrator finds necessary for safety in air commerce and national security.

**(b) Prescribing minimum safety standards.**--The Administrator may prescribe minimum safety standards for--

**(1)** an air carrier to whom a certificate is issued under section 44705 of this title; and

Add. 3

**(2)** operating an airport serving any passenger operation of air carrier aircraft designed for at least 31 passenger seats.

**(c) Reducing and eliminating accidents.**--The Administrator shall carry out this chapter in a way that best tends to reduce or eliminate the possibility or recurrence of accidents in air transportation. However, the Administrator is not required to give preference either to air transportation or to other air commerce in carrying out this chapter.

**(d) Considerations and classification of regulations and standards.**--When prescribing a regulation or standard under subsection (a) or (b) of this section or any of sections 44702-44716 of this title, the Administrator shall--

**(1)** consider--

**(A)** the duty of an air carrier to provide service with the highest possible degree of safety in the public interest; and

**(B)** differences between air transportation and other air commerce; and

**(2)** classify a regulation or standard appropriate to the differences between air transportation and other air commerce.

**(e) Bilateral exchanges of safety oversight responsibilities.**--

**(1) In general.**--Notwithstanding the provisions of this chapter, the Administrator, pursuant to Article 83 bis of the Convention on International Civil Aviation and by a bilateral agreement with the aeronautical authorities of another country, may exchange with that country all or part of their respective functions and duties with respect to registered aircraft under the following articles of the Convention: Article 12 (Rules of the Air); Article 31 (Certificates of Airworthiness); or Article 32a (Licenses of Personnel).

**(2) Relinquishment and acceptance of responsibility.**--The Administrator relinquishes responsibility with respect to the functions and duties transferred by the Administrator as specified in the bilateral agreement, under the Articles listed in paragraph (1) for United States-registered aircraft described in paragraph (4)(A) transferred abroad and accepts responsibility with respect to the functions and duties under those Articles for aircraft registered abroad and described in paragraph (4)(B) that are transferred to the United States.

**(3) Conditions.**--The Administrator may predicate, in the agreement, the transfer of functions and duties under this subsection on any conditions the Administrator deems necessary and prudent, except that the Administrator may not transfer responsibilities for United States registered aircraft described in paragraph (4)(A) to a country that the Administrator determines is not in compliance with its obligations under international law for the safety oversight of civil aviation.

**(4) Registered aircraft defined.**--In this subsection, the term "registered aircraft" means--

Add. 4

**(A)** aircraft registered in the United States and operated pursuant to an agreement for the lease, charter, or interchange of the aircraft or any similar arrangement by an operator that has its principal place of business or, if it has no such place of business, its permanent residence in another country; and

**(B)** aircraft registered in a foreign country and operated under an agreement for the lease, charter, or interchange of the aircraft or any similar arrangement by an operator that has its principal place of business or, if it has no such place of business, its permanent residence in the United States.

**(f) Exemptions.**--The Administrator may grant an exemption from a requirement of a regulation prescribed under subsection (a) or (b) of this section or any of sections 44702-44716 of this title if the Administrator finds the exemption is in the public interest.

## 49 U.S.C. § 46110
## § 46110. Judicial review

**(a) Filing and venue.**--Except for an order related to a foreign air carrier subject to disapproval by the President under section 41307 or 41509(f) of this title, a person disclosing a substantial interest in an order issued by the Secretary of Transportation (or the Under Secretary of Transportation for Security with respect to security duties and powers designated to be carried out by the Under Secretary or the Administrator of the Federal Aviation Administration with respect to aviation duties and powers designated to be carried out by the Administrator) in whole or in part under this part, part B, or subsection (l) or (s) of section 114 may apply for review of the order by filing a petition for review in the United States Court of Appeals for the District of Columbia Circuit or in the court of appeals of the United States for the circuit in which the person resides or has its principal place of business. The petition must be filed not later than 60 days after the order is issued. The court may allow the petition to be filed after the 60th day only if there are reasonable grounds for not filing by the 60th day.

## 5 U.S.C. § 553
## § 553. Rule making

**(e)** Each agency shall give an interested person the right to petition for the issuance, amendment, or repeal of a rule.

## 5 U.S.C. § 706
### § 706. Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall--

**(1)** compel agency action unlawfully withheld or unreasonably delayed; and

**(2)** hold unlawful and set aside agency action, findings, and conclusions found to be--

**(A)** arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

**(B)** contrary to constitutional right, power, privilege, or immunity;

**(C)** in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

**(D)** without observance of procedure required by law;

**(E)** unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

**(F)** unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

## REGULATIONS

## 14 C.F.R. § 11.73
### § 11.73 How does FAA process petitions for rulemaking?

After we have determined the disposition of your petition, we will contact you in writing about our decision. The FAA may respond to your petition for rulemaking in one of the following ways:

(a) If we determine that your petition justifies our taking the action you suggest, we may issue an NPRM or ANPRM. We will do so no later than 6 months after the date we receive your petition. In making our decision, we consider:

(1) The immediacy of the safety or security concerns you raise;

(2) The priority of other issues the FAA must deal with; and

(3) The resources we have available to address these issues.

Add. 6

(b) If we have issued an ANPRM or NPRM on the subject matter of your petition, we will consider your arguments for a rule change as a comment in connection with the rulemaking proceeding. We will not treat your petition as a separate action.

(c) If we have begun a rulemaking project in the subject area of your petition, we will consider your comments and arguments for a rule change as part of that project. We will not treat your petition as a separate action.

(d) If we have tasked ARAC to study the general subject area of your petition, we will ask ARAC to review and evaluate your proposed action. We will not treat your petition as a separate action.

(e) If we determine that the issues you identify in your petition may have merit, but do not address an immediate safety concern or cannot be addressed because of other priorities and resource constraints, we may dismiss your petition. Your comments and arguments for a rule change will be placed in a database, which we will examine when we consider future rulemaking.

## 14 C.F.R. § 21.601
## § 21.601 Applicability and definitions.

(a) This subpart prescribes—

(1) Procedural requirements for issuing TSO authorizations;

(2) Rules governing the holders of TSO authorizations; and

(3) Procedural requirements for issuing letters of TSO design approval.

(b) For the purposes of this subpart—

(1) A TSO issued by the FAA is a minimum performance standard for specified articles used on civil aircraft;

(2) A TSO authorization is an FAA design and production approval issued to the manufacturer of an article that has been found to meet a specific TSO;

(3) A letter of TSO design approval is an FAA design approval for an article that has been found to meet a specific TSO in accordance with the procedures of § 21.621;

(4) An article manufactured under a TSO authorization, an FAA letter of acceptance as described in § 21.613(b), or an article manufactured under a letter of TSO design approval described in § 21.621 is an approved article for the purpose of meeting the regulations of this chapter that require the article to be approved; and

(5) An article manufacturer is the person who controls the design and quality of the article produced (or to be produced, in the case of an application), including any related parts, processes, or services procured from an outside source.

Add. 7

## 14 C.F.R. § 25.803
## § 25.803 Emergency evacuation.

(a) Each crew and passenger area must have emergency means to allow rapid evacuation in crash landings, with the landing gear extended as well as with the landing gear retracted, considering the possibility of the airplane being on fire.
(b) [Reserved]
(c) For airplanes having a seating capacity of more than 44 passengers, it must be shown that the maximum seating capacity, including the number of crewmembers required by the operating rules for which certification is requested, can be evacuated from the airplane to the ground under simulated emergency conditions within 90 seconds. Compliance with this requirement must be shown by actual demonstration using the test criteria outlined in appendix J of this part unless the Administrator finds that a combination of analysis and testing will provide data equivalent to that which would be obtained by actual demonstration.

## 14 C.F.R. § 25.807
## § 25.807 Emergency exits

(a) Type. For the purpose of this part, the types of exits are defined as follows:
(1) Type I. This type is a floor-level exit with a rectangular opening of not less than 24 inches wide by 48 inches high, with corner radii not greater than eight inches.
(2) Type II. This type is a rectangular opening of not less than 20 inches wide by 44 inches high, with corner radii not greater than seven inches. Type II exits must be floor-level exits unless located over the wing, in which case they must not have a step-up inside the airplane of more than 10 inches nor a step-down outside the airplane of more than 17 inches.
(3) Type III. This type is a rectangular opening of not less than 20 inches wide by 36 inches high with corner radii not greater than seven inches, and with a step-up inside the airplane of not more than 20 inches. If the exit is located over the wing, the step-down outside the airplane may not exceed 27 inches.
(4) Type IV. This type is a rectangular opening of not less than 19 inches wide by 26 inches high, with corner radii not greater than 6.3 inches, located over the wing, with a step-up inside the airplane of not more than 29 inches and a step-down outside the airplane of not more than 36 inches.
(5) Ventral. This type is an exit from the passenger compartment through the pressure shell and the bottom fuselage skin. The dimensions and physical configuration of this type of exit must allow at least the same rate of egress as a

Add. 8

Type I exit with the airplane in the normal ground attitude, with landing gear extended.

(6) Tailcone. This type is an aft exit from the passenger compartment through the pressure shell and through an openable cone of the fuselage aft of the pressure shell. The means of opening the tailcone must be simple and obvious and must employ a single operation.

(7) Type A. This type is a floor-level exit with a rectangular opening of not less than 42 inches wide by 72 inches high, with corner radii not greater than seven inches.

(8) Type B. This type is a floor-level exit with a rectangular opening of not less than 32 inches wide by 72 inches high, with corner radii not greater than six inches.

(9) Type C. This type is a floor-level exit with a rectangular opening of not less than 30 inches wide by 48 inches high, with corner radii not greater than 10 inches.

(b) Step down distance. Step down distance, as used in this section, means the actual distance between the bottom of the required opening and a usable foot hold, extending out from the fuselage, that is large enough to be effective without searching by sight or feel.

(c) Over-sized exits. Openings larger than those specified in this section, whether or not of rectangular shape, may be used if the specified rectangular opening can be inscribed within the opening and the base of the inscribed rectangular opening meets the specified step-up and step-down heights.

(d) Asymmetry. Exits of an exit pair need not be diametrically opposite each other nor of the same size; however, the number of passenger seats permitted under paragraph (g) of this section is based on the smaller of the two exits.

(e) Uniformity. Exits must be distributed as uniformly as practical, taking into account passenger seat distribution.

(f) Location.

(1) Each required passenger emergency exit must be accessible to the passengers and located where it will afford the most effective means of passenger evacuation.

(2) If only one floor-level exit per side is prescribed, and the airplane does not have a tailcone or ventral emergency exit, the floor-level exits must be in the rearward part of the passenger compartment unless another location affords a more effective means of passenger evacuation.

(3) If more than one floor-level exit per side is prescribed, and the airplane does not have a combination cargo and passenger configuration, at least one floor-level exit must be located in each side near each end of the cabin.

(4) For an airplane that is required to have more than one passenger emergency exit for each side of the fuselage, no passenger emergency exit shall be more than 60 feet from any adjacent passenger emergency exit on the same side of the same

deck of the fuselage, as measured parallel to the airplane's longitudinal axis between the nearest exit edges.

(g) Type and number required. The maximum number of passenger seats permitted depends on the type and number of exits installed in each side of the fuselage. Except as further restricted in paragraphs (g)(1) through (g)(9) of this section, the maximum number of passenger seats permitted for each exit of a specific type installed in each side of the fuselage is as follows:

Type A
110
Type B
75
Type C
55
Type I
45
Type II
40
Type III
35
Type IV
9

(1) For a passenger seating configuration of 1 to 9 seats, there must be at least one Type IV or larger overwing exit in each side of the fuselage or, if overwing exits are not provided, at least one exit in each side that meets the minimum dimensions of a Type III exit.

(2) For a passenger seating configuration of more than 9 seats, each exit must be a Type III or larger exit.

(3) For a passenger seating configuration of 10 to 19 seats, there must be at least one Type III or larger exit in each side of the fuselage.

(4) For a passenger seating configuration of 20 to 40 seats, there must be at least two exits, one of which must be a Type II or larger exit, in each side of the fuselage.

(5) For a passenger seating configuration of 41 to 110 seats, there must be at least two exits, one of which must be a Type I or larger exit, in each side of the fuselage.

(6) For a passenger seating configuration of more than 110 seats, the emergency exits in each side of the fuselage must include at least two Type I or larger exits.

(7) The combined maximum number of passenger seats permitted for all Type III exits is 70, and the combined maximum number of passenger seats permitted for two Type III exits in each side of the fuselage that are separated by fewer than three passenger seat rows is 65.

Add. 10

(8) If a Type A, Type B, or Type C exit is installed, there must be at least two Type C or larger exits in each side of the fuselage.

(9) If a passenger ventral or tailcone exit is installed and that exit provides at least the same rate of egress as a Type III exit with the airplane in the most adverse exit opening condition that would result from the collapse of one or more legs of the landing gear, an increase in the passenger seating configuration is permitted as follows:

(i) For a ventral exit, 12 additional passenger seats.

(ii) For a tailcone exit incorporating a floor level opening of not less than 20 inches wide by 60 inches high, with corner radii not greater than seven inches, in the pressure shell and incorporating an approved assist means in accordance with § 25.810(a), 25 additional passenger seats.

(iii) For a tailcone exit incorporating an opening in the pressure shell which is at least equivalent to a Type III emergency exit with respect to dimensions, step-up and step-down distance, and with the top of the opening not less than 56 inches from the passenger compartment floor, 15 additional passenger seats.

(h) Other exits. The following exits also must meet the applicable emergency exit requirements of §§ 25.809 through 25.812, and must be readily accessible:

(1) Each emergency exit in the passenger compartment in excess of the minimum number of required emergency exits.

(2) Any other floor-level door or exit that is accessible from the passenger compartment and is as large or larger than a Type II exit, but less than 46 inches wide.

(3) Any other ventral or tail cone passenger exit.

(i) Ditching emergency exits for passengers. Whether or not ditching certification is requested, ditching emergency exits must be provided in accordance with the following requirements, unless the emergency exits required by paragraph (g) of this section already meet them:

(1) For airplanes that have a passenger seating configuration of nine or fewer seats, excluding pilot seats, one exit above the waterline in each side of the airplane, meeting at least the dimensions of a Type IV exit.

(2) For airplanes that have a passenger seating configuration of 10 of more seats, excluding pilot seats, one exit above the waterline in a side of the airplane, meeting at least the dimensions of a Type III exit for each unit (or part of a unit) of 35 passenger seats, but no less than two such exits in the passenger cabin, with one on each side of the airplane. The passenger seat/ exit ratio may be increased through the use of larger exits, or other means, provided it is shown that the evacuation capability during ditching has been improved accordingly.

(3) If it is impractical to locate side exits above the waterline, the side exits must be replaced by an equal number of readily accessible overhead hatches of not less

than the dimensions of a Type III exit, except that for airplanes with a passenger configuration of 35 or fewer seats, excluding pilot seats, the two required Type III side exits need be replaced by only one overhead hatch.

(j) Flightcrew emergency exits. For airplanes in which the proximity of passenger emergency exits to the flightcrew area does not offer a convenient and readily accessible means of evacuation of the flightcrew, and for all airplanes having a passenger seating capacity greater than 20, flightcrew exits shall be located in the flightcrew area. Such exits shall be of sufficient size and so located as to permit rapid evacuation by the crew. One exit shall be provided on each side of the airplane; or, alternatively, a top hatch shall be provided. Each exit must encompass an unobstructed rectangular opening of at least 19 by 20 inches unless satisfactory exit utility can be demonstrated by a typical crewmember.

## 14 C.F.R. § 25.817
### § 25.817 Maximum number of seats abreast.

On airplanes having only one passenger aisle, no more than three seats abreast may be placed on each side of the aisle in any one row.

## 14 C.F.R. § 27.785
### § 27.785 Seats, berths, litters, safety belts, and harnesses

(a) Each seat, safety belt, harness, and adjacent part of the rotorcraft at each station designated for occupancy during takeoff and landing must be free of potentially injurious objects, sharp edges, protuberances, and hard surfaces and must be designed so that a person making proper use of these facilities will not suffer serious injury in an emergency landing as a result of the static inertial load factors specified in § 27.561(b) and dynamic conditions specified in § 27.562.

(b) Each occupant must be protected from serious head injury by a safety belt plus a shoulder harness that will prevent the head from contacting any injurious object except as provided for in § 27.562(c)(5). A shoulder harness (upper torso restraint), in combination with the safety belt, constitutes a torso restraint system as described in TSO–C114.

(c) Each occupant's seat must have a combined safety belt and shoulder harness with a single-point release. Each pilot's combined safety belt and shoulder harness must allow each pilot when seated with safety belt and shoulder harness fastened to perform all functions necessary for flight operations. There must be a means to secure belts and harnesses, when not in use, to prevent interference with the operation of the rotorcraft and with rapid egress in an emergency.

Add. 12

(d) If seat backs do not have a firm handhold, there must be hand grips or rails along each aisle to enable the occupants to steady themselves while using the aisle in moderately rough air.

(e) Each projecting object that could injure persons seated or moving about in the rotorcraft in normal flight must be padded.

(f) Each seat and its supporting structure must be designed for an occupant weight of at least 170 pounds considering the maximum load factors, inertial forces, and reactions between occupant, seat, and safety belt or harness corresponding with the applicable flight and ground load conditions, including the emergency landing conditions of § 27.561(b). In addition—

(1) Each pilot seat must be designed for the reactions resulting from the application of the pilot forces prescribed in § 27.397; and

(2) The inertial forces prescribed in § 27.561(b) must be multiplied by a factor of 1.33 in determining the strength of the attachment of—

(i) Each seat to the structure; and

(ii) Each safety belt or harness to the seat or structure.

(g) When the safety belt and shoulder harness are combined, the rated strength of the safety belt and shoulder harness may not be less than that corresponding to the inertial forces specified in § 27.561(b), considering the occupant weight of at least 170 pounds, considering the dimensional characteristics of the restraint system installation, and using a distribution of at least a 60–percent load to the safety belt and at least a 40–percent load to the shoulder harness. If the safety belt is capable of being used without the shoulder harness, the inertial forces specified must be met by the safety belt alone.

(h) When a headrest is used, the headrest and its supporting structure must be designed to resist the inertia forces specified in § 27.561, with a 1.33 fitting factor and a head weight of at least 13 pounds.

(i) Each seating device system includes the device such as the seat, the cushions, the occupant restraint system, and attachment devices.

(j) Each seating device system may use design features such as crushing or separation of certain parts of the seats to reduce occupant loads for the emergency landing dynamic conditions of § 27.562; otherwise, the system must remain intact and must not interfere with rapid evacuation of the rotorcraft.

(k) For the purposes of this section, a litter is defined as a device designed to carry a nonambulatory person, primarily in a recumbent position, into and on the rotorcraft. Each berth or litter must be designed to withstand the load reaction of an occupant weight of at least 170 pounds when the occupant is subjected to the forward inertial factors specified in § 27.561(b). A berth or litter installed within 15° or less of the longitudinal axis of the rotorcraft must be provided with a padded end-board, cloth diaphram, or equivalent means that can withstand the forward

Add. 13

load reaction. A berth or litter oriented greater than 15° with the longitudinal axis of the rotorcraft must be equipped with appropriate restraints, such as straps or safety belts, to withstand the forward load reaction. In addition—
(1) The berth or litter must have a restraint system and must not have corners or other protuberances likely to cause serious injury to a person occupying it during emergency landing conditions; and
(2) The berth or litter attachment and the occupant restraint system attachments to the structure must be designed to withstand the critical loads resulting from flight and ground load conditions and from the conditions prescribed in § 27.561(b). The fitting factor required by § 27.625(d) shall be applied.


### 14 C.F.R. Pt. 25, App. J
### Appendix J to Part 25—Emergency Evacuation

The following test criteria and procedures must be used for showing compliance with § 25.803:
(a) The emergency evacuation must be conducted with exterior ambient light levels of no greater than 0.3 foot-candles prior to the activation of the airplane emergency lighting system. The source(s) of the initial exterior ambient light level may remain active or illuminated during the actual demonstration. There must, however, be no increase in the exterior ambient light level except for that due to activation of the airplane emergency lighting system.
(b) The airplane must be in a normal attitude with landing gear extended.
(c) Unless the airplane is equipped with an off-wing descent means, stands or ramps may be used for descent from the wing to the ground. Safety equipment such as mats or inverted life rafts may be placed on the floor or ground to protect participants. No other equipment that is not part of the emergency evacuation equipment of the airplane may be used to aid the participants in reaching the ground.
(d) Except as provided in paragraph (a) of this appendix, only the airplane's emergency lighting system may provide illumination.
(e) All emergency equipment required for the planned operation of the airplane must be installed.
(f) Each internal door or curtain must be in the takeoff configuration.
(g) Each crewmember must be seated in the normally assigned seat for takeoff and must remain in the seat until receiving the signal for commencement of the demonstration. Each crewmember must be a person having knowledge of the operation of exits and emergency equipment and, if compliance with § 121.291 is

Add. 14

also being demonstrated, each flight attendant must be a member of a regularly scheduled line crew.

(h) A representative passenger load of persons in normal health must be used as follows:

(1) At least 40 percent of the passenger load must be female.

(2) At least 35 percent of the passenger load must be over 50 years of age.

(3) At least 15 percent of the passenger load must be female and over 50 years of age.

(4) Three life-size dolls, not included as part of the total passenger load, must be carried by passengers to simulate live infants 2 years old or younger.

(5) Crewmembers, mechanics, and training personnel, who maintain or operate the airplane in the normal course of their duties, may not be used as passengers.

(i) No passenger may be assigned a specific seat except as the Administrator may require. Except as required by subparagraph (g) of this paragraph, no employee of the applicant may be seated next to an emergency exit.

(j) Seat belts and shoulder harnesses (as required) must be fastened.

(k) Before the start of the demonstration, approximately one-half of the total average amount of carry-on baggage, blankets, pillows, and other similar articles must be distributed at several locations in aisles and emergency exit access ways to create minor obstructions.

(l) No prior indication may be given to any crewmember or passenger of the particular exits to be used in the demonstration.

(m) The applicant may not practice, rehearse, or describe the demonstration for the participants nor may any participant have taken part in this type of demonstration within the preceding 6 months.

(n) Prior to entering the demonstration aircraft, the passengers may also be advised to follow directions of crewmembers but may not be instructed on the procedures to be followed in the demonstration, except with respect to safety procedures in place for the demonstration or which have to do with the demonstration site. Prior to the start of the demonstration, the pre-takeoff passenger briefing required by § 121.571 may be given. Flight attendants may assign demonstration subjects to assist persons from the bottom of a slide, consistent with their approved training program.

(o) The airplane must be configured to prevent disclosure of the active emergency exits to demonstration participants in the airplane until the start of the demonstration.

(p) Exits used in the demonstration must consist of one exit from each exit pair. The demonstration may be conducted with the escape slides, if provided, inflated and the exits open at the beginning of the demonstration. In this case, all exits must be configured such that the active exits are not disclosed to the occupants. If this

method is used, the exit preparation time for each exit utilized must be accounted for, and exits that are not to be used in the demonstration must not be indicated before the demonstration has started. The exits to be used must be representative of all of the emergency exits on the airplane and must be designated by the applicant, subject to approval by the Administrator. At least one floor level exit must be used.

(q) Except as provided in paragraph (c) of this section, all evacuees must leave the airplane by a means provided as part of the airplane's equipment.

(r) The applicant's approved procedures must be fully utilized, except the flightcrew must take no active role in assisting others inside the cabin during the demonstration.

(s) The evacuation time period is completed when the last occupant has evacuated the airplane and is on the ground. Provided that the acceptance rate of the stand or ramp is no greater than the acceptance rate of the means available on the airplane for descent from the wing during an actual crash situation, evacuees using stands or ramps allowed by paragraph (c) of this appendix are considered to be on the ground when they are on the stand or ramp.